UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| JOHN OFORI-TENKORANG, | 05 Civ. 2921 |
| Plaintiff, | ECF CASE |
| - against - | COMPLAINT |
| AMERICAN INTERNATIONAL GROUP, INC., AIG FINANCIAL PRODUCTS CORP., AIG INTERNATIONAL INC., and AIG TRADING GROUP INC. | PLAINTIFF DEMANDS TRIAL BY JURY IN THIS ACTION |
| Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff John Ofori-Tenkorang, also known as John Ofori ("plaintiff" or "Ofori"), by his attorneys, Vladeck, Waldman, Elias & Engelhard, P.C., complaining of defendants American International Group, Inc., AIG International Inc., AIG Financial Products Corp., and AIG Trading Group Inc. (collectively "AIG" or "defendants") alleges as follows:

NATURE OF THE ACTION

1. This action is brought to remedy discrimination on the basis of race in the terms, conditions, and privileges of employment, and in violation of 42 U.S.C. § 1981 et seq. ("Section 1981") and the New York State Human Rights Law, Executive Law § 290 et seq. ("Executive Law") and to remedy defendants' retaliation against plaintiff because of his opposition to unlawful discrimination on the basis of his race in violation of Section 1981 and the Executive Law. This action is also brought to remedy defamation under New York State common law.

2. Injunctive and declaratory relief, damages, and other appropriate legal and equitable relief are sought pursuant to Section 1981, the Executive Law, and New York State common law.

JURISDICTION AND VENUE

3. Plaintiff is a black man who is a permanent resident of the State of Connecticut, and has been employed by AIG in Connecticut since September 23, 1996. In the fall of 2003, AIG's offices in Connecticut assigned plaintiff to work on a temporary basis as an expatriate in South Africa.

4. Defendant American International Group, Inc. is a corporation with its principal place of business in New York, New York. Upon information and belief, defendant American International Group, Inc. is the parent corporation of defendants AIG International Inc., AIG Financial Products Corp., and AIG Trading Group Inc. Defendant AIG International Inc. is a subsidiary of American International Group, Inc., with its principal place of business in Greenwich, Connecticut. Defendant AIG Financial Products Corp. is a subsidiary of American International Group, Inc. with its principal place of business in Wilton, Connecticut. Defendant AIG Trading Group Inc. is a subsidiary of American International Group, Inc., with its principal place of business in Greenwich, Connecticut. Defendants are employers within the meaning of Section 1981 and the Executive Law.

5. Jurisdiction of this Court with respect to the Section 1981 claim is proper under 28 U.S.C. § 1331. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over plaintiff's Executive Law and New York State common law claims, which derive from the same facts and circumstances as his Section 1981 claim.

6. As a substantial part of the events giving rise to plaintiff's claims occurred within the Southern District of New York and as defendant American International Group, Inc. resides in the Southern District of New York, venue is proper within this District.

FACTUAL ALLEGATIONS

7. Plaintiff possesses Bachelor, Master, and Doctoral degrees of Science in Electrical Engineering and Computer Science, which he earned from the Massachusetts Institute of Technology in 1989, 1991, and 1996 respectively. Plaintiff also earned an Electrical Engineer's Degree from the Massachusetts Institute of Technology in 1991. Plaintiff has also completed a number of courses in financial accounting and derivatives at the New York Institute of Finance in New York City.

8. Plaintiff began working at AIG's Connecticut offices in September 1996 as a Research Analyst with the title of Assistant Vice President. Throughout the first seven years of his employment with AIG in Connecticut, Ofori received excellent performance reviews and periodic raises, promotions, and substantial bonuses commensurate with these reviews. By September 2003, Ofori held the position of Structurer and Marketer in AIG's Financial Services Division, with the title of Vice President. As a Connecticut AIG employee, AIG's New York offices paid Ofori's salary, bonuses, and business expenses. AIG's Connecticut offices, however, provided Ofori with human resources and legal support.

9. In 2003, Graeme Linnett ("Linnett"), a Managing Director of AIG Trading Group Inc., who worked in AIG's Connecticut office and currently works as a consultant for AIG based in Connecticut, Bradley Klein, a Senior Vice President of AIG Trading Group Inc. who worked in AIG's Connecticut office, and Joseph Cassano, ("Cassano"), President and Chief

226731 v2

3

Executive Officer of AIG Financial Products Corp., who works in AIG's London and Connecticut offices, decided to temporarily assign Ofori to work on an expatriate basis in South Africa.

        10.     AIG provided Ofori with a Confirmation of Assignment Letter concerning the terms of his temporary assignment to South Africa. The Confirmation of Assignment Letter was issued by AIG's offices in New York, and signed by Robert Capilupi ("Capilupi"), Director of International Human Resources, who worked in AIG's office in New York. On September 2, 2003 plaintiff executed the agreement. The agreement refers to South Africa as Ofori's "host country," and the United States as Ofori's "home country." The agreement specifically states that United States domestic unemployment compensation laws do not cover services performed by American citizens outside of the United States, but does not refer to any other employment laws. As an expatriate employee of AIG's Connecticut office:

        a.     AIG pays Ofori in United States dollars, which are directly deposited to his bank account in Connecticut;

        b.     AIG pays for the preparation of Ofori's United States and South African tax returns;

        c.     Upon information and belief, AIG's offices in New York pay for his South African taxes, and deduct United States taxes, including Social Security taxes from monies paid to him. AIG's New York offices in turn pay these monies to the United States Federal Government;

        d.     Ofori is "covered by US Social Security" during his stay in South Africa;

        e.     AIG provided Ofori with contacts in its New York offices for any

questions he might have regarding his tax treatment or relocation;

    f. Upon information and belief, AIG's New York office pays for the cost of Ofori's housing in South Africa, the cost of a leased car in South Africa, and the cost of insurance and gas for the car;

    g. AIG paid the cost of shipping Ofori's "personal effects" from the United States to South Africa;

    h. AIG provided in its Confirmation of Assignment Letter that if AIG fired him while he was working in South Africa, they would pay for the cost of his airfare back to the United States, and the cost of shipping his "personal effects" back to the United States. The agreement further provided, "The air passage and the cost of shipment by sea of such personal effects are payable if you leave your foreign station and return home as soon as possible after you are relieved of your duties . . . . ;"

    i. Although AIG normally includes a promise to pay expatriates for at least one trip to their "homes" per year in its Confirmation of Assignment Letters, Capilupi, indicated that such a provision did not have to be included in Ofori's letter because it was anticipated that Ofori would be required to make business trips back to Connecticut and could see his family then; and

    j. AIG agreed to provide annually Ofori's children with one set of round trip tickets to South Africa so that they can visit him during his stay in South Africa.

  11. AIG took responsibility for filling out the paperwork that would enable Ofori to work in South Africa, and upon information and belief, AIG's offices in New York paid the costs for the processing of this paperwork. The documents that AIG prepared included:

    a. An Application for Temporary Residence Permit, which stated that

Ofori's residential and postal addresses were in Connecticut, and that his place of work was in Connecticut;

    b. An Application for Change of Conditions or Status, which again identified Ofori's residence as Connecticut, and stated that Ofori would provide services to AIG's offices in South Africa as a Financial Engineer on a work permit that would only be valid until October 31, 2005.  The application further explicitly stated that the offer of employment by AIG in this position was for a period of two years;

    c. A letter dated September 18, 2003, from AIG to the Immigration Division of the South African Department of Home Affairs, which stated that AIG would "guarantee all repatriation costs for [Ofori] . . . at no cost to the South African government whatsoever;" and

    d. A letter dated September 18, 2003, from AIG to the South African Home Office regarding the Motivation of Application for a Work Permit for Ofori, which stated in part that AIG's growth in South Africa required AIG to bring individuals with specialized skills to its Johannesburg office, the head office for AIG in Africa and that Ofori had specialized skills that AIG's South African offices needed to continue this growth.  The letter further guaranteed that all repatriation costs for Ofori would be borne by AIG.

    12. The details of Ofori's temporary assignment to South Africa were arranged by AIG personnel in Connecticut and New York, including Dennis Zampella, AIG's Human Resources officer in Connecticut and New York, Capilupi, and Cindy Feldman, then AIG's International Human Resources Specialist in New York.

    13. AIG's Human Resources and Legal departments in Connecticut continued to provide service to Ofori during his stay in South Africa.

14. While stationed in South Africa, Ofori continued to work with Linnett, and other members of the marketing, quantitative, and legal departments of AIG in Connecticut.

15. Cassano and Robert Pierce Jones ("Jones"), a Managing Director of AIG Financial Products Corp., who worked at AIG's office in London, met Ofori for the first time at AIG's office in London on Tuesday, July 8, 2003 while Ofori was en route from New York to Johannesburg on a business trip. Cassano and Jones were, at that time, in the process of the integrating the businesses of AIG International Inc., and AIG Financial Products Corp. Cassano and Jones agreed with Ofori's impending temporary relocation to South Africa.

16. Upon information and belief, all AIG expatriates in South Africa, other than Ofori, work in the main office in Johannesburg. Upon information and belief, all AIG expatriate employees in its Johannesburg office are white, except for one female Human Resources representative, Juliet Muchenje, who is black. When AIG transferred Ofori to South Africa, Cassano and Jones decided that Ofori would not work in the main office in Johannesburg. Instead, Jones and Cassano arranged for Ofori to work in the office of a white South African businessman.

17. Before he began working in the office of the businessman, Ofori discovered that the businessman had been implicated in a number of questionable business deals and possible corruption, which resulted in the Johannesburg Stock Exchange imposing a fine on him. In fact, at least one of the businessman's associates had been convicted of criminal charges in connection with these practices, and served an eight-year jail term in a South African prison. Ofori alerted Jones and Cassano to his concerns about sharing an office with such a businessman, and asked to be permitted to work in AIG's Johannesburg office. Jones and Cassano refused Ofori's request, although Linnett, after a meeting with the businessman, noted in

226731 v2

7

an e-mail to Cassano, that he could not see the added benefit of having Ofori work in the businessman's office, and wondered why the businessman should be so anxious to have Ofori work in the office.

18. From the time that he began working in South Africa, Ofori found that Cassano singled him out for particular scrutiny and ridicule. For example, Ofori found that he had to be much more careful than his white colleagues when attempting to obtain reimbursement for business related expenses. Ofori found that he had to keep detailed records and receipts and then shepherd the records through several layers of review, before they were finally reviewed and approved by Cassano.

19. Ofori's attempts to get business cards for his new position in South Africa were hampered by delays in London. Although Cassano was aware of these difficulties, he embarrassed Ofori at a meeting with AIG clients because Ofori had no business cards to present.

20. During his first visit to South Africa on September 9 and 10, 2003, Cassano repeatedly tried to blame Ofori for the gross disenchantment exhibited by senior executives in the South African business community as a result of AIG's involvement in a costly litigation with FirstRand Bank Limited ("RMB"). Ofori told Cassano that he was not involved in that litigation, and had nothing to do with the underlying situation, and therefore that Cassano should not paint him with the same brush as he painted those who were. Cassano responded by excluding Ofori from attending a follow-up meeting with the Chief Executives of RMB on November 24, 2003, even though Ofori had attended the first meeting with the RMB Executives on September 10, 2003.

21. During 2003, Ofori was engaged in legal proceedings in connection with a domestic relations matter with his ex-fiancée in Connecticut. In October 2003, Ofori's AIG

employment and compensation records were subpoenaed in connection with that matter.

22. On October 14, 2003, Ofori was called to a meeting in AIG's London office with Cassano, Jones, and Rhian Bliss, an Executive Director and Counsel of AIG Financial Products Corp., who works in AIG's London office. During the meeting, Cassano questioned Ofori closely about the domestic relations proceeding, demanding to know why he had not been informed about it. Although Ofori replied that the matter was a personal one, and that he did not see why he should have told AIG, Cassano refused to accept this response. Cassano then unjustly criticized Ofori's performance. Before he was sent to South Africa, Ofori had only been responsible for work related to structuring metals, commodities, and foreign exchange transactions, and his expertise was in these areas. When Ofori arrived in South Africa, Cassano informed Ofori that he wanted Ofori to also handle AIG business related to tax, accounting, equity, interest rate, and credit derivatives. While Ofori tried to comply with Cassano's request, he was unable to reach full proficiency in this area during the first few weeks following his arrival in South Africa. Despite this, Cassano severely criticized Ofori's tax and accounting performance during the meeting that Ofori attended on October 14, 2003 and threatened Ofori with termination of his employment if his performance in these areas did not improve.

23. On October 17, 2003, Ofori was given a letter about poor performance and was told that if his performance did not improve by mid-December 2003, he would be fired. This was the only poor performance review that he had ever received from AIG since joining the companies in September 1996.

24. In December 2003, Ofori was told that he would not receive a bonus from AIG for the work that he had performed for AIG in 2003. When Ofori complained, AIG relented

and gave him a bonus for 2003.  Ofori's bonus was one-sixth of what he had received in 2002. Upon information and belief, the white South African businessman, who only set up some meetings for Cassano and Jones during their two visits to South Africa in September and November of 2003 received, a 50% higher bonus than Ofori who had worked diligently the whole year.

25. In December 2004, the businessman in whose office Ofori worked, reported that he believed that someone had tried to steal money from him by transferring funds out of his bank accounts.

26. At the time that the businessman reported the transfers, there were four individuals other than the businessman who worked in the office: two white women, Ofori, and a black driver.  A South African detective, an Afrikaner who had previously worked for the South African government during Apartheid, conducted an abbreviated "investigation" of the charges. As part of the "investigation," on December 9, 2004, the detective, acting as a "Truth Verification Examiner," conducted a "Computeri[z]ed Voice Stress Analysis," which is a form of lie detector test, on each of the four individuals who worked in the businessman's office.

27. During the day of December 9, 2004, at about 4:00 p.m., Ofori discovered that his access to AIG's computer systems had been disabled.  At about 9:00 p.m. on December 9, 2004, Mauro Gabriele ("Gabriele"), President Directeur General, of a subsidiary of AIG Financial Products Corp., who works out of AIG's offices in London and Paris, telephoned Ofori and told him that AIG had decided to suspend him pending the completion of the "investigation," and directed Ofori to give up his keys to the businessman's office.  Gabriele never asked Ofori what had transpired in the businessman's office that afternoon.

28. On December 10, 2004, the South African detective reported to the

businessman that he had determined that Ofori and the black driver had fraudulently transferred the money. None of the white employees in the businessman's office, including his secretary and bookkeeper, who had access to information on the bank accounts, was implicated in this fraud.

29. On December 10, 2004, the businessman forwarded the detective's findings to Gabriele with an e-mail in which he wrote:

> I think this is nonsense as there are so many inaccuracies. . [.] I told them I never had funds withdrawn . . [.] the investigator said he knew but he was tired when he typed the report at 4 a.m. in the morning . . [.] also if you look at Santi [the businessman's bookkeeper] they say she is hiding things and yet they don't want to question [h]er further. I also cannot believe that John [Ofori] would do something like that. I will get the inspector to fast forward the investigation . . [.] have tried to get hold of him a few times this morning and he does not reply

Even after receipt of this statement by the purported victim, AIG continued to keep Ofori on suspension.

30. In January 2005, AIG retained the services of Kroll Associates, a private investigation firm, to review the matter. It took Kroll Associates nearly two months to complete the investigation.

31. During his suspension, Ofori was prohibited from speaking with any AIG employees or AIG clients. When Ofori received calls and/or e-mails from his colleagues and/or clients, he was forced to forward the messages to Gabriele. AIG told Ofori's colleagues and clients that he was "on leave." Ofori's colleagues and clients were then told to contact other AIG employees who would take care of their business. Ofori was not informed whether his suspension was to be with pay or without pay until after Ofori sent Gabriele an email on December 27, 2004, inquiring about his compensation and benefits, including health and life

insurance.

33. Defendants periodically, at the beginning of the financial year, hold a mandatory global conference for all of their senior personnel stationed domestically and abroad to convene and discuss business issues for the year ahead. This conference also serves as a great networking opportunity for employees and a way for them to meet each other. This year, the conference was held in New York City in January 2005. Although arrangements had been made for Ofori to attend the conference, he was not permitted to attend. Many of Ofori's colleagues commented on Ofori's conspicuous absence and attempted to contact him via telephone and email as to why he was not at the conference. Ofori, of course, was prohibited from responding to these inquiries.

33. Ofori never received a review of his performance in 2004. Gabriele, however, told Ofori in January 2005, after all of Ofori's colleagues had been reviewed and paid bonuses in December 2004, that Ofori would not receive a bonus for the work that he had performed in 2004. Gabriele told Ofori that his suspension was not the reason that he would not receive a bonus, but rather that he would not receive a bonus because he had failed to close deals. This criticism was false, and it was the first time that Ofori had ever been accused of failing to close deals. Upon information and belief, at least one of Ofori's colleagues, who is white, who did not close any deals, was given a bonus for 2004. Moreover, Cassano has repeatedly stated that AIG maintains only one profit and loss account for all employees, and that bonuses are paid based on AIG's overall performance, and not simply whether an individual closed a particular transaction. Upon information and belief, Ofori was the only marketer under Cassano who did not receive a bonus for work performed in 2004.

34. Ofori fully cooperated with all aspects of the investigation. Gabriele

informed plaintiff that Kroll Associates' preliminary report indicated that Ofori was innocent of any misconduct.  Gabriele telephoned Ofori to inform him about this finding but qualified his remarks with the fact that these findings were verbal and preliminary, and that other invasive procedures such as a credit check, a "lifestyle check," and a full forensic test on his computer remained to be done.  Gabriele asked Ofori to resume work in the businessman's office while the criminal investigation was ongoing.  Ofori expressed his great concern in working in an environment which was still a crime scene and in which he was labeled a "suspect."

35.     On February 1, 2005, Gabriele instructed Ofori via email to resume work in the businessman's office notwithstanding the fact that the criminal investigation of him by Kroll Associates was still ongoing.  At the time that he was reinstated, Ofori had no computer at work, as his computer was still in the custody of Kroll Associates, undergoing a forensic audit.  Ofori later learned that that AIG had erased his computer mail set-up, which then had to be recreated.

36.     Following his return from suspension, Ofori resumed his former duties with full force and vigor.  Ofori, soon found, however, that working in the office in which he had been accused of stealing took a toll on his emotional well-being.  Ofori became increasingly fearful that another similar incident might occur, and found it difficult to work with his colleagues and clients, who suspected that Ofori had been suspended for some sort of wrong doing.  Ofori's doctor, who Ofori had seen during his suspension, referred him to a specialist in late February 2005, about aggravated symptoms arising from Ofori's distress.  The specialist determined that Ofori was not well enough to work, and on February 25, 2005 wrote a letter to AIG that stated that Ofori should be given a medical leave.  On that same day, Ofori sent by fax the doctor's note to Gabriele's attention at AIG's Paris office.  When Gabriele did not

acknowledge receipt of the fax, Ofori followed up with an email to Gabriele on February 26, 2005.

37. On February 28, 2005, Ofori wrote an e-mail to Gabriele stating that Kroll Associates had informed him that they had completed their investigation and that a final report had been sent to Gabriele. Ofori was anxious to read about Kroll's findings and requested a copy of the report, but Gabriele refused.

38. On March 1, 2005, Ofori wrote an e-mail to Gabriele in which he advised Gabriele that he had retained counsel to represent him on issues related to his employment with AIG.

39. When Gabriele received Ofori's e-mail, he responded by demanding that Ofori's doctor specify the date and time of the doctor's determination that Ofori was not well enough to work, and demanded that the doctor provide a specific date on which Ofori would be well enough to work. When Ofori provided additional information via e-mail, Gabriele insisted that Ofori provide the originals of the doctor's note, and did not accept copies. Upon information and belief, white employees of AIG are not required to provide documentation of the date and time of their doctors' diagnoses of their conditions, nor are they required to provide originals of doctor's notes.

40. Defendants have never issued an apology to Ofori for the indignities that he suffered during the investigation, nor have they issued a statement that Ofori was absolved from any wrong doing in connection with the matter or given him a letter stating that he had been cleared and was no longer under suspicion of theft.

FIRST CLAIM: SECTION 1981

41. Plaintiff repeats and realleges ¶¶ 1-40 of this Complaint as if set forth fully

226731 v2

herein.

42. By the acts and practices described above, defendants discriminated against plaintiff in the terms and conditions of his employment on the basis of his race in violation of Section 1981.

43. Defendants acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

44. As a result of defendants' discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

## SECOND CLAIM: SECTION 1981 RETALIATION

45. Plaintiff repeats and realleges ¶¶ 1-44 of this Complaint as if set forth fully herein.

46. By the acts and practices described above, defendants retaliated against plaintiff for his opposition to unlawful employment practices, in violation of Section 1981.

47. Defendants acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

48. As a result of defendants' retaliatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

## THIRD CLAIM: EXECUTIVE LAW

49. Plaintiff repeats and realleges ¶¶ 1-48 of this Complaint as if set forth fully herein.

50. By the acts and practices described above, defendants discriminated against

plaintiff on the basis of his race in violation of the Executive Law.

51. As a result of defendants' discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

## FOURTH CLAIM: EXECUTIVE LAW RETALIATION

52. Plaintiff repeats and realleges ¶¶ 1-51 of this Complaint as if set forth fully herein.

53. By the acts and practices described above, defendants retaliated against plaintiff for his opposition to unlawful employment practices, in violation of the Executive Law.

54. As a result of defendants' retaliatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

## FIFTH CLAIM:  DEFAMATION

55. Plaintiff repeats and realleges ¶¶ 1-54 of this Complaint as if set forth fully herein.

56. As a result of AIG's actions including their: 1) lengthy investigation of Ofori, in which AIG forced Ofori to submit to a voice stress analysis, multiple interrogations, a forensic test on his computer, a credit check, and a "lifestyle check," 2) suspension of Ofori during the investigation, during which time he was prohibited from speaking with any AIG colleague or client, even to the extent of explaining the reason for his absence, and 3) refusal to permit him to attend an annual meeting that all senior AIG employees were required to attend, AIG communicated the false message to Ofori's peers, colleagues, and staff members, as well as the

financial industry and the general public, that Ofori was guilty of gross misconduct or unlawful activities.

57. AIG defamed Ofori per se, as Ofori's professional reputation has been severely damaged by AIG's actions against Ofori, and because AIG accused him of committing a crime.

58. As a result of AIG's defamation of Ofori, Ofori has suffered substantial monetary damages, including lost income and benefits, and will continue to suffer such damages until and unless this Court grants relief.

59. As a result of AIG's defamation of Ofori, Ofori has suffered severe emotional distress and humiliation as well as physical symptoms.

60. AIG's conduct against Ofori was willful and malicious.

61. Plaintiff is now suffering irreparable injury and monetary damage from defendants' defamatory conduct and will continue to do so unless and until the Court grants relief.

PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

(a) declaring the acts and practices complained of herein are in violation of Section 1981, the Executive Law, and New York State common law;

(b) enjoining and permanently restraining these violations of Section 1981, the Executive Law, and New York State common law;

(c) directing defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiff's employment opportunities;

(d) directing defendants to place plaintiff in the position he would have occupied

but for defendants' unlawful conduct and making him whole for all earnings he would have received but for defendants' unlawful conduct, including, but not limited to, wages, pension, bonuses, and other lost benefits;

   (e) directing defendants to pay an additional amount to compensate plaintiff for the emotional distress defendants' unlawful conduct caused plaintiff;

   (f) directing defendants to pay plaintiff an additional amount as punitive damages;

   (g) awarding plaintiff such interest as is allowed by law;

   (h) awarding plaintiff reasonable attorney's fees and costs; and

   (i) granting such other and further relief as this Court deems necessary and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a trial by jury in this action.

Dated: New York, New York
   March 16, 2005

         VLADECK, WALDMAN, ELIAS
          & ENGELHARD, P.C.

      By: _____
        Anne C. Vladeck (AV 4857)
        Attorneys for Plaintiff
        1501 Broadway, Suite 800
        New York, New York  10036
        (212) 403-7300

226731 v2