UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
JOHN OFORI-TENKORANG,                   :
                                        :    05 Civ. 2921 (DLC)
                   Plaintiff,           :
                                        :    OPINION AND ORDER
        -v-                             :
                                        :
AMERICAN INTERNATIONAL GROUP, INC., AIG :
FINANCIAL PRODUCTS CORP., AIG           :
INTERNATIONAL, INC., and AIG TRADING    :
GROUP, INC.,                            :
                                        :
                   Defendants.          :
                                        :
----------------------------------------X

Appearances:

For the Plaintiff:

Anne C. Vladeck
Rebecca J. Osborne
Vladeck, Waldman, Elias & Engelhard, P.C.
1501 Broadway, Suite 800
New York, New York  10036


For the Defendants:

Marc E. Bernstein
70 Pine Street, 31st Floor
New York, New York  10270

P. Kevin Connelly
Kristine Aubin
Connelly Sheehan Harris
150 South Wacker Drive, Suite 1600
Chicago, Illinois  60606


DENISE COTE, District Judge:

        In this employment discrimination case, John Ofori-Tenkorang

("Ofori"), alleges that his employer, defendants American

International Group, Inc. and various subsidiaries (collectively

"AIG"), discriminated against him based on his race in violation

of 42 U.S.C. § 1981 ("Section 1981") and New York State Human Rights Law, N.Y. Exec. Law § 290 et seq. ("NYHRL"), and defamed him, after sending him on a temporary assignment to South Africa. AIG has moved to dismiss this action, claiming among other things that Section 1981 and NYHRL do not apply extraterritorially, and that common law defamation does not cover allegations based solely on a defendant's conduct, as opposed to its statements. AIG also contends that the defamation claim should be dismissed under the doctrine of forum non conveniens.  For the following reasons, the motion to dismiss is granted as to the Section 1981 claim.  The Court declines to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Ofori's NYHRL and defamation claims.

## BACKGROUND

The following facts are taken from Ofori's complaint ("Complaint").  Ofori is a black man who is a permanent resident of the State of Connecticut, and has been employed by AIG in Connecticut since September 23, 1996.  He has a doctoral degree in electrical engineering and computer science from the Massachusetts Institute of Technology.  By September 2003, after periodic raises and promotions, Ofori held the position of Structurer and Marketer in AIG's Financial Services Division with the title of Vice President.  AIG's New York offices paid Ofori's salary, bonuses, and business expenses, while AIG's Connecticut office provided Ofori with human resources and legal support.

In the fall of 2003, executives from AIG's Connecticut office and Joseph Cassano ("Cassano"), President and Chief Executive Officer of AIG Financial Products Corp. who works in AIG's London and Connecticut offices, decided to assign Ofori to work temporarily on an expatriate basis in South Africa.  On September 2, Ofori executed a Confirmation of Assignment Letter agreement ("Agreement") that had been signed by the Director of International Human Resources who worked in AIG's New York office.  The Agreement set forth the terms of Ofori's assignment to South Africa, and refers to South Africa as Ofori's "host country," and the United States as Ofori's "home country." Details of Ofori's South African assignment were arranged by AIG personnel in Connecticut and New York.

Under Ofori's status as an expatriate employee, AIG paid Ofori in U.S. dollars, directly deposited into Ofori's Connecticut bank account, paid Ofori's South African housing and transportation costs, prepared the necessary paperwork to permit Ofori to live and work in South Africa, promised to pay for Ofori's return to the United States in the event his employment were terminated while he was abroad, and promised to pay for one annual flight to South Africa for his children, among other things.  Ofori was also covered by U.S. Social Security during his employment in South Africa.

Cassano and Robert Pierce Jones ("Jones"), a Managing Director of AIG Financial Products Corp. who worked in AIG's London office, met Ofori on July 8, 2003 while Ofori was en route

from New York to Johannesburg on a business trip.  All AIG
expatriates in South Africa, other than Ofori, work in AIG's main
office in Johannesburg, and all employees in that office are
white other than one black female Human Resources employee,
Juliet Muchenje.  Cassano and Jones decided that Ofori would work
in the office of a white South African businessman (the
"Businessman").[1]  After learning that the Businessman had been
implicated in a corruption scandal, Ofori requested that Cassano
and Jones permit him to work in the main AIG office in
Johannesburg.  Cassano and Jones refused this request.

Ofori alleges that he was singled out for scrutiny and
ridicule from the moment he began working in South Africa.  He
claims that unlike white colleagues, he had to keep detailed
records and receipts and wade through layers of bureaucratic
review in order to obtain business reimbursements that were
approved by Cassano.  Ofori also claims that although Cassano was
aware that Ofori's attempts to obtain new business cards were
hampered by delays in London, Cassano embarrassed Ofori at a
meeting with AIG clients because Ofori had no business cards to
offer.  During Cassano's first visit to South Africa after Ofori
had commenced employment there, on September 9 and 10, 2003,
Cassano repeatedly blamed Ofori for extreme displeasure exhibited
by senior executives in the South African business community due
to AIG's involvement in a costly litigation there.  After Ofori

---

[1]  This individual is not mentioned by name in the
Complaint.

objected that this was unfair because he was not involved, Cassano excluded Ofori from attending an important meeting on November 23 that was a follow-up to a meeting Ofori had attended on September 10.

When Ofori arrived in South Africa, Cassano assigned Ofori to handle matters outside Ofori's previous areas of expertise, and Ofori was unable to reach full proficiency in these areas in the first few weeks.  Cassano, Jones, and Rhian Bliss, an Executive Director and Counsel of AIG Financial Products Corp. who works in AIG's London office, summoned Ofori to a meeting in London on October 14 where Cassano severely criticized Ofori's performance and threatened him with termination of his employment if his performance did not improve.  This was later reiterated in a letter of October 17 that constituted the only poor performance review Ofori had received from AIG since commencing work in 1996. Cassano also allegedly interrogated Ofori about a domestic relations proceeding between Ofori and his ex-fiancee in Connecticut for which Ofori's employment and compensation records had been subpoenaed, and refused to accept Ofori's explanation that the matter was personal.

In December 2003, Ofori was told that he would not receive a bonus from AIG for his work that calendar year.  When Ofori complained, he received a bonus that was one-sixth the value of his bonus from the previous year, and half of what the Businessman had received as a bonus in 2003 despite having only

set up a few meetings for Cassano and Jones in September and November.

In December 2004, the Businessman reported that he believed that someone had tried to steal money from him by transferring funds out of his bank accounts. At that time, there were four individuals working in the Businessman's office other than the Businessman: two white women who were the Businessman's secretary and bookkeeper, Ofori, and a black driver. A South African detective, an Afrikaner who had previously worked for the South African government during Apartheid, conducted an abbreviated investigation of the charges, including subjecting Ofori to a computerized voice stress analysis on December 9. That same day, at 4:00 p.m., Ofori discovered that his access to the AIG computer system had been suspended. Later that day, Mauro Gabriele ("Gabriele"), President Directeur General of an AIG Financial Products Corp. subsidiary, who works out of AIG's London offices, telephoned Ofori and informed him that he had been suspended pending the completion of the investigation and directed Ofori to surrender his keys to the Businessman's office. On December 10, the detective reported to the Businessman that he had determined that Ofori and the black driver had fraudulently transferred the money. That day, the Businessman forwarded the detective's findings to Gabriele, calling the findings "nonsense" and stating that "there are so many inaccuracies." AIG continued Ofori's suspension.

In January 2005, AIG hired Kroll Associates ("Kroll"), a private investigation firm, to conduct an independent investigation, which took nearly two months to complete.  During his suspension, Ofori was prohibited from speaking with any AIG employees or AIG clients.  When Ofori received calls or e-mails from colleagues or clients, he was forced to forward the messages to Gabriele.  AIG, in turn, told Ofori's colleagues and clients that he was on leave, and that they should contact other AIG employees who would handle their business.  Ofori was also not permitted to attend a global AIG conference in January in New York for senior personnel and was not allowed to respond to numerous inquiries from colleagues regarding his conspicuous absence from the conference.

Ofori never received a performance evaluation for 2004, and Gabriele told Ofori in January 2005, after all of Ofori's colleagues had been reviewed and paid bonuses in December 2004, that Ofori would not receive a bonus for 2004 because he failed to close deals that year.  Ofori alleges that this criticism was untrue, that it was the first time he had received such a criticism, that at least one of his colleagues, who is white, failed to close any deals in 2004 and still received a 2004 bonus, and that Ofori was the only marketer under Cassano who did not receive a bonus for 2004.

Gabriele informed Ofori that Kroll's preliminary report indicated that Ofori was innocent of any misconduct, and on February 1, 2005, instructed Ofori via e-mail to resume work in

the Businessman's office notwithstanding the fact that the investigation was ongoing.  Ofori expressed concern about working in an environment that was still a crime scene and in which he was still labeled a suspect.  Ofori resumed his former duties, although at the time he was reinstated he had no computer at work as it was still in Kroll's custody, undergoing forensic checks.

Ofori alleges that he soon found that working in the office in which he had been accused of stealing took a toll on his emotional well-being, that he feared another similar incident, and that it was difficult to work with his colleagues and clients there.  Ofori's doctor referred him to a specialist in late February 2005, to treat aggravated symptoms arising from Ofori's distress.  The specialist determined that Ofori was not well enough to work, and wrote a letter on February 25, 2005, indicating that Ofori should be given medical leave.  Ofori faxed this letter to Gabriele that same day, and, receiving no response, followed up with an e-mail on February 26.  On February 28, Ofori sent an e-mail to Gabriele indicating that Kroll had completed its investigation and had sent a final report to Gabriele, and that Ofori wished to see a copy of the final report.  Gabriele refused.

On March 1, Ofori wrote an e-mail to Gabriele advising him that he had retained counsel to represent him on issues related to his employment with AIG.  Gabriele responded by demanding that Ofori's doctor specify the date and time of the doctor's determination that Ofori was not well enough to work, and provide

a specific date on which Ofori would be well enough to work.
When Ofori provided additional information via e-mail, Gabriele
insisted that Ofori provide the originals of the doctor's note,
and refused to accept copies.  Ofori alleges that white employees
of AIG are not required to provide documentation of the date and
time of their doctors' diagnoses of their conditions, nor are
they required to provide originals of doctors' notes.  AIG has
never issued a statement indicating that Ofori was absolved from
any wrongdoing in connection with the investigation or given him
a letter stating that he had been cleared and was no longer under
suspicion of theft.

Claims and Procedural History

     Ofori filed this action on March 16, 2005.  The Complaint
alleges five causes of action.  The first two causes of action
are for discrimination and retaliation pursuant to Section 1981.
The third and fourth causes of action are for discrimination and
retaliation pursuant to NYHRL.  The fifth cause of action is for
common law defamation.

     AIG's motion to dismiss argues that Ofori's Section 1981 and
NYHRL claims should be dismissed because neither of those
provisions applies extraterritorially, and the discrimination
Ofori alleges took place outside the United States.  AIG's motion
also argues that Ofori's defamation claim should be dismissed
because (1) it is based only on AIG's alleged conduct, not its

statements, and (2) it is not connected to New York, making it an inconvenient forum for this litigation.

## DISCUSSION

To dismiss an action pursuant to Rule 12(b)(6), a court must determine that "it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief." Scutti Enters., LLC v. Park Place Entm't Corp., 322 F.3d 211, 214 (2d Cir. 2003) (citation omitted).  In construing the complaint, the court must "accept[] as true the factual allegations in the complaint as true and draw[] all inferences in the plaintiff's favor."  Id. If it is clear, however, that "no relief could be granted under any set of facts that could be proved consistent with the allegations," the complaint should be dismissed.  Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 514 (2002).


Section 1981

As noted, AIG moves to dismiss the Section 1981 claims on the ground that the statute does not apply extraterritorially. Section 1981 of Title 42, United States Code, provides:

> All persons within the jurisdiction of the United
> States shall have the same right in every State and
> Territory to make and enforce contracts, to sue, be
> parties, give evidence, and to the full and equal
> benefit of all laws and proceedings for the security of
> persons and property as is enjoyed by white citizens,
> and shall be subject to like punishment, pains,
> penalties, taxes, licenses, and exactions of every
> kind, and to no other.

42 U.S.C. § 1981 (emphasis supplied).

Although Congress has the power to enforce its laws outside U.S. territory, "[i]t is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 248 (1991) ("Aramco") (citation omitted). See also Small v. United States, 125 S. Ct. 1752, 1755 (2005); United States v. Gatlin, 216 F.3d 207, 211 (2d Cir. 2000). In this area of statutory construction, courts "look to see whether language in the relevant Act gives any indication of a congressional purpose to extend its coverage beyond places over which the United States has sovereignty or has some measure of legislative control." Aramco, 499 U.S. at 248 (citation omitted). In so doing, courts "are permitted to consider all available evidence about the meaning of the statute, including its text, structure, and legislative history." Gatlin, 216 F.3d at 212 (citation omitted). Courts "assume that Congress legislates against the backdrop of the presumption against extraterritoriality," and therefore courts will assume Congress is addressing "domestic conditions" unless "the affirmative intention of the Congress" to address extraterritorial conditions is "clearly expressed." Aramco, 499 U.S. at 248 (citation omitted).

The language of Section 1981 does not indicate a congressional purpose to extend its coverage beyond the territorial jurisdiction of the United States. On the contrary,

it affirmatively reinforces its domestic application where it states that it applies to "[a]ll persons within the jurisdiction of the United States" with the goal of securing equal rights "in every State and Territory."  42 U.S.C. § 1981.

The structure and history of Section 1981 also do not evince a congressional purpose to extend coverage beyond the territorial jurisdiction of the United States.  What was eventually codified as Section 1981 originated in 1866 as part of "a major piece of Reconstruction legislation" in the wake of the Civil War.  <u>Runyon v. McCrary</u>, 427 U.S. 160, 168 n.8 (1976).  <u>See</u> Civil Rights Act of 1866, ch. 31, 14 Stat. 27 (1866).  The object of that legislation was to make "all persons <u>born in the United States</u>" citizens of the United States, and to ensure that all citizens retained the same basic rights "<u>in every State and Territory in the United States</u>" as "white citizens" regardless of their "race and color" and "without regard to any previous condition of slavery or involuntary servitude."  Civil Rights Act of 1866, ch. 31, sec. 1, 14 Stat. 27, 27 (1866) (emphasis supplied).[2]  This

---

[2]  Section 1 of the Civil Rights Act of 1866 states:
Be it enacted by the Senate and House of
Representatives of the United States of America in
Congress assembled, That all persons born in the United
States and not subject to any foreign power, excluding
Indiana not taxed, are hereby declared to be citizens
of the United States; and such citizens, of every race
and color, without regard to any previous condition of
slavery or involuntary servitude, except as a
punishment for crime whereof the party shall have been
duly convicted, shall have the same right, in every
State and Territory in the United States, to make and
enforce contracts, to sue, be parties, and give
evidence, to inherit, purchase, lease, sell, hold, and

provision was reenacted in 1870, <u>see</u> Voting Rights Act of 1870, ch. 114, sec. 18, 16 Stat. 140, 144 (1870), and was broadened in Section 16 to apply to "all persons within the jurisdiction of the United States." <u>Id.</u> sec. 16.  Section 16 also contained another provision with domestic territorial application, foreclosing states from taxing immigrants from one country differently than immigrants from other countries.  <u>Id.</u>[3]  Congress has never removed the statute's restriction in scope to "in every State and Territory."

---

convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding.

Civil Rights Act of 1866, ch. 31, sec. 1, 14 Stat. 27 (1866).

[3]  Section 16 of the Voting Rights Act of 1870 states: And be it further enacted, That all persons within the jurisdiction of the United States shall have the same right in every State and Territory in the United States to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and none other, and law, statute, ordinance, regulation, or custom to the contrary notwithstanding.  No tax or charge shall be imposed or enforced by any State upon any person immigrating thereto from a foreign country which is not equally imposed and enforced upon every person immigrating to such State from any other foreign country; and any law of any State in conflict with this provision is hereby declared null and void.

Voting Rights Act of 1870, ch. 114, sec. 16, 16 Stat. 140, 144 (1870).

The Equal Protection Clause of the Fourteenth Amendment, enacted in 1868, contains similar language restricting its scope such that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  The Supreme Court has interpreted this language, in its historical context, to reflect a "territorial theme," Plyler v. Doe, 457 U.S. 202, 212 (1982), such that any person is entitled to the equal protection of the laws "until he leaves the jurisdiction." Id. at 215.[4]  The only published opinions of which this Court is aware that have considered the extraterritorial application of Section 1981 have held that it "applies only to discrimination claims that arise within the territorial United States." Theus v. Pioneer Hi-Bred Int'l, Inc., 738 F. Supp. 1252, 1255 (S.D. Iowa 1990). See also Gallaspy v. Raytheon Technical Servs. Co., No. EP-04-CV-0012-FM, 2005 WL 1902534, at *5 (W.D. Tex. Aug. 9, 2005); Ortiz-Bou v. Universidad Autonoma de Guadalajara, --- F. Supp. 2d ---, No. Civ. 04-2279CCC, 2005 WL 1653735, at *3 (D.P.R. July 13, 2005).[5]

Under this analysis, nothing in the text, structure, or history of Section 1981 indicates that Congress intended it to

---

[4]  The Civil Rights Act of 1866 and the Fourteenth Amendment were debated at the same time in Congress, and the Supreme Court has considered the legislative history of the Civil Rights Act of 1866 in interpreting the scope of the Fourteenth Amendment. See Plyler, 457 U.S. at 214 n.13.

[5]  At least one circuit court has addressed the question in an unpublished decision, see Rodriques v. Martin Marietta Corp., 829 F.2d 39, 1987 WL 44766, at *2 (6th Cir. Sept. 16, 1987) (Section 1981 does not apply extraterritorially).

apply to events outside the territorial jurisdiction of the United States, and it is therefore presumed that Congress did not intend Section 1981 to apply extraterritorially.  As a consequence, Section 1981 does not apply to AIG's alleged discriminatory and retaliatory treatment of Ofori in South Africa.

Ofori argues that the center of gravity of his employment relationship with AIG is in the United States, and that a balancing of contacts would permit his Section 1981 claims to survive.  Where statutes do not apply extraterritorially, courts have rejected the application of a "balancing of contacts" test to permit U.S. jurisdiction over foreign actions with substantial U.S. contacts.  See, e.g., McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 19 (1963); Asplundh Tree Expert Co. v. NLRB, 365 F.3d 168, 178 (3d Cir. 2004).

In Asplundh, even though the statute defined "commerce" broadly,[6] the Third Circuit held that the National Labor

---

[6]  The Asplundh court noted that Section 10 of the NLRA provides that "the Board [NLRB] is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 158) affecting commerce." Asplundh, 365 F.3d at 174 (quoting 29 U.S.C. § 160(a)).  The court also noted that "'[a]ffecting commerce' means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce," id. (quoting 29 U.S.C. § 152(7)), and that the NLRA defined "commerce" broadly as:
> trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia or any Territory of the United States and any State or other Territory, or between any foreign country and any State, Territory, or the

Relations Act ("NLRA") did not apply extraterritorially, and
rejected the argument by the National Labor Relations Board
("NLRB") that it was appropriate to exert jurisdiction over the
case because the "employment relationship" that was at issue was
primarily within the territorial boundaries of the United States.
Asplundh, 365 F.3d at 176.  In that case, the petitioner, a U.S.
corporation, had discharged two employees in response to the
employees' complaint about working conditions while on a five day
temporary work assignment in Ottawa, Canada.  The Third Circuit
held that the "'balancing of contacts' cannot be used to
manufacture jurisdiction in the absence of clearly expressed
congressional intent to extend the NLRA to United States citizens
temporarily working abroad for a United States employer."  Id. at
178.

This reasoning applies with equal force to Section 1981.
Even where, as here, the plaintiff alleges that he was a
permanent resident of the United States on a temporary foreign
assignment for a U.S. employer, the fact that the alleged

---

District of Columbia, or within the District of
Columbia or any Territory, or between points in the
same State but through any other State or any Territory
or the District of Columbia or any foreign country.
Id. (quoting 29 U.S.C. § 152(6)) (emphasis in original).  The
court held that despite such broad definitions, the language of
the NLRA was not sufficient to rebut the presumption against
extraterritoriality, because Aramco rejected an analogous
argument in the context of Title VII's similarly broad
definitions.  Id. at 176.  Like Aramco, "in enacting the NLRA,
Congress included no mechanism for extraterritorial enforcement,
and did not provide a method for resolving any conflicts with
labor laws of other nations."  Id. at 175.

discrimination occurred outside the territorial jurisdiction of the United States is fatal to his claim because Section 1981 does not apply extraterritorially.  The plaintiff's allegations regarding his substantial employment contacts with the United States are irrelevant to the statutory construction analysis of Section 1981.

The cases on which Ofori relies to support his center of gravity analysis do not suggest that that analysis can be applied here.  Ofori analogizes this case to Torrico v. Int'l Bus. Machs. Corp., 213 F. Supp. 2d 390 (S.D.N.Y. 2002), where the court applied a "center of gravity of the entire employment relationship" test to an ADA claim involving foreign events.  Id. at 403.

As the Torrico court noted, Congress had amended the ADA in 1991 in such a way that "clearly manifests Congress's intention to give the statute extraterritorial effect," id. at 397, because, among other things, it had amended the definition of "employee" to provide that "with respect to employment in a foreign country, the term includes an individual who is a citizen of the United States."  Id. (quoting 42 U.S.C. § 12111(4)) (citation omitted).[7]  Ofori's reliance on Olvera-Morales v.

_____

[7]  While it is unnecessary to decide the issue, it appears that the Torrico court erred in using a balancing of contacts test to apply the ADA extraterritorially to a non-citizen in spite of the fact that the ADA, by its own terms, applies only to U.S. citizens "with respect to employment in a foreign country." 42 U.S.C. § 12111(4).  In the context of Title VII, which contains identical extraterritorial language to the ADA, Torrico, 213 F. Supp. 2d at 399, at least one circuit court has held that

Sterling Onions, Inc., 322 F. Supp. 2d 211, 221 (N.D.N.Y. 2004),
is similarly flawed.  The plaintiff in Olvera-Morales brought a
Title VII claim.  Title VII was amended in 1991 in an identical
fashion to the ADA to apply extraterritorially to U.S. citizens
"with respect to employment in a foreign country."  42 U.S.C. §
2000e(f).  See Torrico, 213 F. Supp. 2d at 399.

Finally, Ofori relies on Envtl. Def. Fund, Inc. v. Massey,
986 F.2d 528 (D.C. Cir. 1993).  Massey held that

> the presumption against the extraterritorial
> application of statutes described in Aramco does not
> apply where the conduct regulated by the statute occurs
> primarily, if not exclusively, in the United States,
> and the alleged extraterritorial effect of the statute
> will be felt in Antarctica -- a continent without a
> sovereign, and an area over which the United States has
> a great measure of legislative control.

Id. at 529.  In this context, Massey held that the National
Environmental Policy Act applied to the incineration of food
waste in Antarctica.  Numerous courts have recognized that the
scope of Massey's holding is extremely limited.  See Shekoyan,
409 F.3d at 420 n.3; Basel Action Network v. Maritime Admin., 370
F. Supp. 2d 57, 71-72 (D.D.C. 2005); Born Free USA v. Norton, 278
F. Supp. 2d 5, 19 (D.D.C. 2003), vacated and remanded on other
grounds by No. 03-5216, 2004 WL 180263 (D.C. Cir. Jan 21, 2004);
NEPA Coalition of Japan v. Aspin, 837 F. Supp. 466, 467 (D.D.C.
1993).  Nothing in Massey permits a finding that Section 1981 has

---

the application made by the Torrico court is not valid as a
matter of statutory construction.  Shekoyan v. Sibley Int'l, 409
F.3d 414, 421-22 (D.C. Cir. 2005).

extraterritorial effect.  Therefore, Counts One and Two of the
Complaint -- Ofori's Section 1981 claims -- are dismissed.

New York State Human Rights Law and Defamation Claims

    Ofori claims federal question jurisdiction pursuant to 28
U.S.C. § 1331 for his Section 1981 claims, and supplemental
jurisdiction pursuant to 28 U.S.C. § 1367 for his NYHRL and
defamation claims.  Where a federal district court "dismisse[s]
all claims over which it has original jurisdiction," that court
has discretion over whether to exercise supplemental jurisdiction
over the plaintiff's remaining state law causes of action.  28
U.S.C. § 1367(c)(3); Motorola Credit Corp. v. Uzan, 388 F.3d 39,
55 (2d Cir. 2004).  After dismissing a plaintiff's federal
claims, a court "must reassess its jurisdiction over the case by
considering several related factors -- judicial economy,
convenience, fairness, and comity."  Uzan, 388 F.3d at 56
(citation omitted).  Generally speaking, however, "if all federal
claims are dismissed before trial, the state claims should be
dismissed as well."  Id. (emphasis in original) (citation
omitted).  This is especially true in the absence of special
circumstances, such as dismissal of the federal claims late in
the action or the expenditure of considerable federal time in
assessing the plaintiff's case.  Id.

    In the instant matter, there are no special circumstances
that mitigate in favor of retaining federal jurisdiction.
Conversely, the principle of comity dictates that where a

19

plaintiff's remaining claims solely sound in state law, a federal court should decline to exercise jurisdiction.  As a result, Ofori's state-law claims are dismissed pursuant to 28 U.S.C. § 1367(c)(3).

**CONCLUSION**

The motion to dismiss is granted with prejudice as to Counts One and Two of the Complaint -- Ofori's Section 1981 claims. Ofori's remaining claims are dismissed in their entirety pursuant to 28 U.S.C. § 1367, without prejudice to the refiling of the state law claims in state court.  The Clerk of Court shall close the case.

SO ORDERED:

Dated:    New York, New York
          September 20, 2005

                              DENISE COTE
                    United States District Judge

20